UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JACKIE L. WARD, JR.,

       Plaintiff,

v.                                   Case No.  6:21-cv-1887-PGB-DCI

CORRECTIONAL OFFICER
NORTON, DIRECTOR FLOWERS,
NICASTRO, and CENTURION
HEALTH,

       Defendants.
_____/

**ORDER**

THIS CAUSE is before the Court on Defendant Norton's Motion for Summary Judgment and Exhibits ("Motion for Summary Judgment," Doc. Nos. 58 – 58-6), Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Exhibits ("Response," Doc. Nos. 62 – 62-11), and Defendant's Reply to Response ("Reply," Doc. 63).[1] As discussed hereinafter, Defendant Norton's Motion for Summary Judgment (Doc. 58) is denied.

---

[1] The Court previously dismissed Plaintiff's claims against the other Defendants and the official capacity claim against Defendant Norton. *See* Doc. 40. Plaintiff sued Defendant Nurse Nicastro in her official capacity and Centurion Health Services in its official and individual capacities. (Doc. 7 at 3.) In dismissing Plaintiff's claims against these Defendants, the Court misstated that Defendant

---

Nurse Nicastro was sued in her individual capacity. *See* Doc. 40. However, Plaintiff agreed that his claim against Defendant Nurse Nicastro should be dismissed. *See* Doc. 25 at 3, 9 ("Plaintiff agrees that Centurion cannot be held liable under Section 1983, so the official capacity claim against Nicastro is due to be dismissed"). Moreover, Plaintiff's claims against Defendant Centurion Health Services were properly dismissed. *See, e.g., Spencer v. Corizon Health, Inc.*, No. 3:17-CV-73-BJD-PDB, 2022 WL 2047861, at *4-5 (M.D. Fla. June 7, 2022) (explaining that "to proceed against a municipality, including a private medical company under contract with a municipality, a plaintiff must allege the existence of a 'custom or policy that constituted deliberate indifference to [a] constitutional right' and that caused a constitutional violation" and concluding that the plaintiff stated claims against Corizon and Centurion because he alleged that they had a policy and/or custom which considered together with his allegations regarding their denial of treatment permitted "the reasonable inference that the companies providing care for inmates had an official or unofficial policy or custom of declining to provide" medications or other indicated treatment for inmates) (footnote omitted); *see also Cooper v. Fla. Dep't of Corr.*, No. 3:19-CV-309-J-39MCR, 2020 WL 4287269, at *4 (M.D. Fla. July 27, 2020) (dismissing claim against Corizon because the complaint did not identify a policy or custom of Corizon's that resulted in delayed or inadequate medical treatment and explaining *inter alia* that "[e]ven if an individual Corizon employee intentionally delayed providing treatment for Plaintiff (which Plaintiff does not allege), a claim against Corizon cannot proceed upon a theory of respondeat superior. Supervisory officials, including private corporations like Corizon, cannot be held liable under § 1983 in the absence of allegations identifying a policy or custom that was the moving force behind a constitutional violation. . . . While systemic deficiencies in a prison health care's treatment protocol can suggest deliberate indifference, Plaintiff does not allege systemic deficiencies. *His claim is premised solely on the adequacy of the care he received* after the attack. *See, e.g., Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 944 (11th Cir. 2017) (holding the plaintiff failed to demonstrate municipal liability because her 'claim that Corizon had a custom of providing inadequate medical care' was based solely on her own experiences, which constituted 'at most, proof of a single incident of unconstitutional activity') (quoting *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1312 (11th Cir. 2011)).") (emphasis added); *Gaines v. Jones*, No. 3:18-CV-1332-J-39PDB, 2019 WL 1400470, at *16 (M.D. Fla. Mar. 28, 2019) ("Because Corizon's liability under § 1983 would be based on its functional equivalence to the government entity responsible for providing medical and mental health care and services to FDOC inmates, Plaintiff must plead that an official policy or a custom or practice

2

## I. STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010) (citing Fed. R. Civ. P. 56). At this stage of the proceedings, "the evidence and all reasonable inferences from that evidence are viewed in the light most favorable to the nonmovant, but those inferences are drawn 'only 'to the extent supportable by the record.'" *Id.* (quoting *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010)). The burden of establishing that there is no genuine issue of material fact lies on the moving party, and it is a stringent one. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the initial burden is met, then the nonmoving party may not rest on his pleadings, but must 'go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file', designate 'specific facts showing that there is a genuine issue for trial' in order to avoid summary judgment." *Wells v. Cramer*, 262 F. App'x 184, 186-87 (11th Cir. 2008) (quoting *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1281-82 (11th Cir. 1999)).

---

of Corizon was the moving force behind the alleged federal constitutional violation.").

The nonmoving party, so long as that party has had an ample opportunity to conduct discovery, must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). In other words, "[f]ollowing discovery, the plaintiff opposing summary judgment may not rely on facts in the complaint, but must raise genuine issues of material fact to counter facts supporting the defendant's claim of qualified immunity." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (citing *Hutton v. Strickland,* 919 F.2d 1531, 1537 (11th Cir. 1990)). "Though the facts alleged in an inmate's sworn pleading are sufficient to defeat a motion for summary judgment and a separate affidavit is not necessary, mere conclusions and unsupported factual allegations are legally insufficient to defeat summary judgment." *Wells*, 262 F. App'x at 187 (citing *Sammons v. Taylor,* 967 F.2d 1533, 1544 n. 5 (11th Cir. 1992)). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## II.  FACTUAL BACKGROUND[2]

Plaintiff sues Defendant Norton (hereinafter "Defendant" or "Defendant

___

[2] In considering Defendant Norton's Motion for Summary Judgment, the following statement is derived from the Amended Complaint (Doc. Nos. 7 – 7-8) and the evidence submitted by Plaintiff and Defendant.

Norton") for denial and delay of medical care in violation of the Fourteenth Amendment. (Doc. 7 at 3.) Plaintiff, who indicates he suffers from previous back trauma and is normally under the care of the Veteran's Administration, alleges that he suffered unknown damage to his lower back and right knee on July 8, 2021. (Doc. 7-3 at 1, 3, 6.) The facts surrounding the incident are as follows.

On the morning of July 8, 2021, Defendant transported Plaintiff from the Volusia Correctional Facility ("Facility") to the Branch Jail ("Jail") to attend a Zoom meeting with his attorney. (Doc. 58-5 at 8-9.) The Facility and Jail are separate buildings on adjoining property that are about a quarter mile away by a drive that takes less than a minute. Movement of inmates from one facility to the other requires transport. (Doc. Nos. 58-1 at 2; 58-5 at 8-9.) The van in which Plaintiff rode that day had an interior floor that is approximately two feet off the ground and a step that is one foot off the ground. (Doc. 58-1 at 2, 4-8.)

Upon arriving at the Jail, Plaintiff, who was handcuffed to Inmate Dadd ("Dadd"), was the last to exit the van. (Doc. 58-5 at 10.) As Plaintiff exited the van into the Jail sallyport, Defendant Norton extended his hand as if to assist Plaintiff's descent, but as Plaintiff stepped out, Defendant pulled back his hand, and Plaintiff fell. (Doc. 62-11 at 2.) Plaintiff and Defendant did not know each other before that day and had no hostility or animosity toward each other. (Doc. 58-5 at 10-11.) At 8:14 a.m., Plaintiff fell on the concrete and injured his right leg and back. (Doc.

Nos. 58-5 at 11-12; 58-2 at 2; 62-11 at 2.)

While Plaintiff was lying on the ground for a short time, Defendant Norton asked him if he would be able to walk. (Doc. Nos. 58-5 at 12; 62-11 at 2.) Plaintiff avers that he told Defendant Norton that he was injured, and Defendant disregarded his request for medical care. (Doc. 62-11 at 2.) In response to Defendant's question whether he could walk, Plaintiff told Defendant that he thought he could, and Dadd helped him up. (Doc. Nos. 58-5 at 12; 62-11 at 2.) According to Plaintiff, "while attempting to stand[,] he felt something shift and pop in [his] back" and again requested medical care but was denied. (Doc. 62-11 at 3.) After Plaintiff got up, he tried to walk but could not do so without Dadd's assistance. (Doc. 62-11 at 2.) Defendant made Plaintiff walk, and Dadd helped Plaintiff, who was limping but not bleeding, into the Jail from the sallyport. (Doc. Nos. 58-5 at 12; 62-11 at 2.) According to Dadd, he had to practically carry Plaintiff into the Jail. (Doc. 62-3 at 2.)

Plaintiff maintains that he again asked Defendant for medical care after the pain in his knee and back became worse from trying to walk while handcuffed and chained to Dadd. (Doc. 62-11 at 2.) Neither Defendant nor Plaintiff is a medical professional, and neither has any medical training. (Doc. Nos. 58-1 at 2; 58-5 at 18.) According to Defendant, he did not appreciate that Plaintiff (1) had suffered a significant injury, or (2) had a serious medical need that posed a serious risk of

6

harm if left unattended on that date. (Doc. 58-1 at 2.) Further, Defendant Norton
avers he knew inmates have access to medical care throughout Volusia County
Department of Corrections ("VCDC"), and he never placed Plaintiff in isolation.
(*Id.* at 2.)

Upon entering the Jail, Plaintiff and the other inmates in the van were taken
to a holding cell near the attorney visitation rooms. (Doc. 58-5 at 12.) Defendant
avers that he had no additional contact with Plaintiff until the control room officers
announced that the inmates were ready to return to the Facility. (Doc. 58-1 at 2.)
The door to the holding cell remained open, and Plaintiff and Dadd were no longer
handcuffed. (Doc. 58-5 at 12-13.) Defendant was not responsible for supervising
the inmates in the holding cell or directing them to the meeting room with their
attorneys. (Doc. Nos. at 58-1 at 2; 58-5 at 13.) Rather, officers at the Jail in a nearby
control room called Plaintiff's name and directed him to walk by himself to the
attorney meeting room, approximately fifty feet from the holding cell. (Doc. Nos.
58-2 at 3; 58-5 at 13.) Plaintiff did so albeit by hopping. (Doc. 58-5 at 13.) When
Plaintiff spoke to his attorney that day, he might have mentioned he had just had
an accident, but he did not ask her to help him get medical attention. (*Id.* at 13-14.)
After Plaintiff spoke with his attorney, he notified the control officer or another
officer in the Jail that he was finished and was directed to return to the holding
cell. (Doc. 58-5 at 13-14.)

At approximately 11:30 a.m., Defendant transported Plaintiff, who was again handcuffed to Dadd, from the sallyport of the Jail to the sallyport of the Facility. (Doc. Nos. 58-1 at 3; 58-5 at 14-15.) Dadd assisted Plaintiff to the van and into the Facility. (Doc. 58-5 at 12.) Dadd avers that he assisted Plaintiff by supporting most of his weight until they returned to their dorm. (Doc. 62-3 at 3.)

After Defendant drove Plaintiff and the other inmates back to the Facility, Plaintiff did not see Defendant again that day. (Doc. 58-5 at 15.) Defendant estimates that he was in Plaintiff's presence for less than ten minutes on July 8, 2021, and Plaintiff agrees that his interaction with Defendant was minimal and limited to Defendant transporting him to and from the sallyports of the Facility and the Jail and vice versa. (Doc. Nos. 58-1 at 2-3; 58-5 at 15.)

By 11:31 a.m., Plaintiff arrived back at Dorm # 2 of the Facility where he was housed. (Doc. Nos. 58-1 at 3; 58-5 at 14.) Dorm # 2 is an open bunk, barrack-style dorm where inmates are not isolated in individual cells. (Doc. Nos. 58-2 at 2; 58-5 at 9.) Inmates in Dorm # 2 can communicate with both officers and medical staff and are readily observed by the Housing Unit Officer, and they can interact with that officer at the officer station. (Doc. 58-2 at 2.) Although Defendant was not assigned to Dorm # 2, he knew that inmates in that dorm have access to medical personnel. (Doc. 58-1 at 3.)

When Plaintiff returned to Dorm # 2, he told the dorm officers that he was

hurting and was told to talk to medical. (Doc. 58-5 at 15-16.) Around noon, Plaintiff spoke to medical personnel about his fall, but he or she did not help him and instead told him he needed to speak to someone on another shift. (Doc. 58-5 at 16.) Plaintiff subsequently spoke with other medical personnel who were rude and did not help him. (*Id.*) That evening at approximately 7:55 p.m., Plaintiff told Defendant Nurse Nicastro that he had slipped and twisted his right knee earlier in the day while exiting a transport van, and she was the first medical personnel who took Plaintiff's complaint seriously. (Doc. Nos. 58-2 at 2; 58-5 at 16-17.)

Defendant Nurse Nicastro prompted Officer Bordas, the Housing Unit Officer of Dorm # 2 whose shift began at 5:45 p.m., to complete an accident report. (Doc. Nos. 58-2 at 1-2; 58-5 at 15-17.) Officer Bordas avers that before 7:55 p.m., he was unaware that Plaintiff had slipped or claimed any injury although he had been there for approximately two hours. (Doc. 58-2 at 2.) Upon being informed of the incident, Officer Bordas reviewed the Ocularis Camera System and confirmed that Plaintiff had fallen in the Jail sallyport at 8:14 a.m.[3] (*Id.*) According to Officer Bordas, having watched the video and observed Plaintiff, he did not think Plaintiff had a serious medical condition that required immediate medical attention. (Doc.

---

[3] Defendant attests that he does not have the authority or ability to preserve Ocularis security camera footage. (Doc. 58-1 at 3.) Further, the footage is irretrievable after thirty days, and Defendant avers that he did not learn that Plaintiff accused him of wrongdoing until after that time expired. (*Id.*)

58-2 at 2.) Officer Bordas, however, noted in the VCDC Inmate Injury and Accident Report that Plaintiff's knee was swollen, and he placed an order for Plaintiff to be seen by a physician the following day. (Doc. 62-6 at 2.) At 11:05 p.m., Nurse Moreno evaluated Plaintiff per Defendant Nurse Nicastro's orders. (Doc. Nos. 58-2 at 3-4; 58-5 at 17.)

Nurse Moreno's report reflects that Plaintiff stated that he hurt his right knee falling from a transport van, and she documented that Plaintiff's right knee was swollen, but that Plaintiff indicated no complaint of pain at the moment. (Doc. Nos. 58-3 at 3; 58-5 at 17.) Plaintiff, however, disputes that he told Nurse Moreno that he was not in pain. (Doc. 58-5 at 17.) Nurse Moreno gave Plaintiff 600 mg of Ibuprofen around 11:28 p.m. on July 8, 2021, which he continued to receive until July 15, 2021. (Doc. 58-3 at 3-4.) Plaintiff was told that he would receive an x-ray of his knee within twenty-four hours. Nurse Moreno requested an "x-ray on Monday to right knee," which would have been July 12, 2021, however, Plaintiff's knee was x-rayed on July 26, 2021. (Doc. Nos. 58-3; 58-5 at 17-18.)

Dr. Scott Silas, an orthopedic surgeon who routinely treats patients with knee and lower back pain, reviewed *inter alia* the Amended Complaint, the VCDC Inmate Injury and Accident Report, Plaintiff's medical records from VCDC and the Florida Department of Corrections ("FDOC"), Plaintiff's deposition, and a video of Plaintiff at a court appearance on July 14, 2021, and he attests as follows.

10

*See* Doc. 58-3 at 1-2.

Regarding the medical treatment Plaintiff received after the incident, Dr. Silas attests that "Ibuprofen is a nonsteroidal anti-inflammatory drug (NSAID) indicated for the relief of mild to moderate pain. . . [and] is commonly used for conditions such as headaches, dental pain, muscle aches, . . . and minor aches and pains from acute injury or the common cold or flu." (*Id.* at 4.) Further, Plaintiff's medical records from VCDC reflect that the month preceding the incident, Plaintiff received the same dosage of Ibuprofen 600 mg – one tablet orally twice daily – as he received after the incident. (*Id.*)  According to Dr. Silas, "[p]roviding Ibuprofen does not suggest that [Plaintiff] suffered a serious medical injury that posed a substantial risk of serious harm to [Plaintiff] if left unattended on July 8, 2021." (*Id.*)

Further, Dr. Silas reviewed the VCDC July 26, 2021 x-ray report of Plaintiff's right knee and attests that it "does not suggest that [Plaintiff] suffered a traumatic injury on July 8, 2021." (*Id.* at 4-5.) Rather, the report "noted the presence of chondrocalcinosis[,]" which "is not indicative of a healing fracture or traumatic injury two or three weeks earlier." (*Id.* at 5.) According to Dr. Silas, the x-ray "shows no fracture or significant swelling suggesting a serious medical injury." (*Id.*) In addition, another x-ray report dated March 28, 2022, of Plaintiff's right knee in the VCDC medical records includes findings of "soft tissue swelling within the

11

prepatellar space but no destructive process," which "redemonstrated mild changes associated with chondrocalcinosis." (*Id.* at 5.) Dr. Silas maintains that the second x-ray does not suggest that Plaintiff suffered a serious medical injury that posed a substantial risk of serious harm if left unattended on July 8, 2021. (*Id.*)

With respect to Plaintiff's lower back, Dr. Silas reviewed an x-ray report of Plaintiff's lumbar spine dated March 21, 2022. (*Id.* at 5.) The x-ray "revealed scattered degenerative disc disease (DDD) and spurring worse at L-4 and L5-S1. Grade 2 spondylolisthesis at L4-5 with pars defect was also noted." (*Id.*) Dr. Silas avers that these "findings suggest an age-related condition caused by the wear and tear of spinal discs and vertebra or a congenital condition." (*Id.*) According to Dr. Silas, the lumbar x-ray does not indicate that Plaintiff suffered a serious medical injury that posed a substantial risk of serious harm to Plaintiff if left unattended on July 8, 2021. (*Id.* at 5-6.)

After Plaintiff's lumbar spine x-ray, Nurse Practitioner Clough assessed Plaintiff with lumbar disc degeneration and spondylolisthesis. (*Id.* at 6.) Her notes stated that Plaintiff was "holding lower back while ambulating, not limping but does ambulate slowly." (*Id.*) She "found no obvious weakness or deformity, and no complaints of deformity[,]" and she instituted a plan of treatment that included "Naproxen 375 mg (one tablet orally twice daily), Prilosec 20 mg (one capsule orally at bedtime), and passes for a lower bunk, extra mattress, and a cane." (*Id.*)

"Naproxen is a non-narcotic NSAID, similar to Ibuprofen commonly used for mild to moderate pain, body aches, and headaches[,]" and Prilosec is used to treat heartburn symptoms. (*Id.* at 6.) Dr. Silas attests that Nurse Practitioner Clough's March 2022 assessment does not suggest that Plaintiff suffered a serious medical injury that posed a substantial risk of serious harm if left unattended on July 8, 2021. (*Id.*)

Dr. Silas also reviewed the video of Plaintiff's court appearance on July 14, 2021, six days after Plaintiff fell. (*Id.* at 6.) Dr. Silas attests that Plaintiff was able to walk and stand without assistance and with no outward signs of distress. (*Id.*) Plaintiff, however, attests that at his court proceeding, he had severe pain in his knee and lower back and leaned against the wall as much as possible. (Doc. 62-11 at 3.) Dr. Silas avers that the video does not suggest that Plaintiff suffered a serious medical injury that posed a substantial risk of harm if left unattended on July 8, 2021.[4] (*Id.* at 6-7.) Finally, Dr. Silas attests that from his review of the evidence Plaintiff did not suffer any broken bones, loss of blood, or a significant injury on July 8, 2021, nor did he suffer any detrimental effect caused by a delay in medical treatment on that date. (*Id.*)

---

[4] Defendant submitted the recording of Plaintiff's July 14, 2021, court appearance as an exhibit to the Motion for Summary Judgment. The recording shows Plaintiff standing for approximately five minutes and then quickly walking out of the courtroom. Plaintiff appears to have no difficulty standing or walking. Further, Plaintiff has no detectable limp.

According to Plaintiff, since the date of his fall, he has "suffered bouts of numbness, tingling, and intense pain because of the back injury [he] suffered that day." (Doc. 62-11 at 3.) However, in October 2022, Plaintiff was transferred to the FDOC from VCDC, and although Nurse Clough provided Plaintiff a cane pass in March 2022, Plaintiff has not used a cane or asked for one since his transfer. (Doc. 58-5 at 20-21.) In addition, in February 2023, Plaintiff ran two miles as part of his preferred exercise routine, although he maintains it was very painful. (*Id.* at 20.) Other than being given pain relievers, Plaintiff has not received any additional medical treatment for his knee or back. (*Id.* at 19.) To demonstrate that the spondylolisthesis in his lumbar spine diagnosed by Nurse Practitioner Clough resulted from his fall, Plaintiff submitted a radiology report from May 4, 2021, that concludes there was "no evidence for acute fracture or spondylolisthesis." (Doc. 62-10 at 2-3.) However, the report relates to a CT of Plaintiff's cervical spine, not his lumbar spine. *See id.*

## III.  ANALYSIS

Defendant asserts that he is entitled to summary judgment based on qualified immunity. To that end, Defendant argues that Plaintiff has not demonstrated that he was deliberately indifferent to Plaintiff's constitutional right to medical care. (Doc. 58 at 1-2.) To support this argument, Defendant contends that the record evidence does not establish that (1) Plaintiff suffered an objectively

14

serious medical need, (2) Defendant subjectively knew that Plaintiff had an urgent medical need likely to be exacerbated by delayed medical treatment or that he disregarded the risk to Plaintiff by a degree that exceeded gross negligence, and (3) Defendant's purported deliberate indifference caused Plaintiff constitutionally significant injury. (*Id.* at 15-18.) Additionally, Defendant maintains he is entitled to qualified immunity because any constitutional violation that occurred was not clearly established at the time of the incident. (*Id.* at 19-24.)

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (quotation omitted). To be entitled to qualified immunity, a government official first must demonstrate that "'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)). If the defendant satisfies this burden, then the Court must grant qualified immunity unless the plaintiff can demonstrate first, that the facts viewed in the light most favorable to the plaintiff establish a constitutional violation by the officers; and, second, that it was clearly established at the time of the incident that the actions of the defendant were unconstitutional.

*See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009). Courts are permitted to exercise discretion in determining which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *See Pearson*, 555 U.S. at 236.

The Court concludes from the evidence presented that Defendant was acting in the scope of his discretionary authority at the time of the incident. Consequently, the Court next considers whether Plaintiff has provided sufficient facts from which a jury could determine that Defendant was deliberately indifferent to a serious medical need and whether it was clearly established that Defendant's action at the time of the incident was unconstitutional.

## A.    Deliberate Indifference to a Serious Medical Need Prong

To establish a Fourteenth Amendment deliberate indifference claim, a plaintiff must prove that (1) he "had an 'objectively serious medical need,' (2) [the defendant] acted with subjective 'deliberate indifference to [his] serious medical need,' and (3) [his] injury was caused by the defendant's wrongful conduct." *Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1188 (11th Cir. 2020) (quoting *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)).

"A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention,' and, in either instance, 'that, if left unattended, poses a substantial risk of serious harm[.]'" *Id.* (internal quotation and citation marks omitted). As to the second element, whether the defendant acted with subjective deliberate indifference, "the plaintiff must prove: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than gross negligence." *Pounds v. Dieguez*, 850 F. App'x 738, 739 (11th Cir. 2021) (citing *Harper v. Lawrence Cty., Ala.*, 592 F.3d 1227, 1234 (11th Cir. 2010)). "In deciding whether an official's conduct was 'more than gross negligence,' the Eleventh Circuit regularly considers three additional factors: '(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay.'" *Howard v. Wilkinson*, 305 F. Supp. 3d 1327, 1335 (M.D. Fla. 2018) (quoting *Goebert*, 510 F.3d at 1327). The third element of a deliberate indifference claim requires a defendant be causally connected to the constitutional harm. *Goebert*, 510 F.3d at 1327.

"'[E]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable.'" *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). "An inmate who

17

complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. Dekalb Reg'l Youth Ctr.*, 40 F.3d 1176, 1188–89 (11th Cir. 1994*), overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002).

Considering the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has provided evidence from which a reasonable jury could conclude that Defendant acted with deliberate indifference to Plaintiff's serious medical need. With respect to the first element, the Eleventh Circuit has:

> "recognized a variety of medical needs as serious medical needs," including finding that "broken bones and bleeding cuts are serious medical needs that require attention within hours." *Melton v. Abston*, 841 F.3d 1207, 1222 (11th Cir. 2016) (per curiam). "Severe pain that is not promptly or adequately treated can also constitute a serious medical need depending on the circumstances." *Id.; see also Brown v. Hughes*, 894 F.2d 1533, 1538 n.4 (11th Cir. 1990) (per curiam) (collecting cases and noting that a "recent traumatic injury," such as a beating, automobile accident, soft-tissue shoulder injury, or a one and a half inch bleeding cut, is generally sufficient to demonstrate a serious medical need).

*Harris v. Prison Health Servs.*, 706 F. App'x 945, 951 (11th Cir. 2017); *but see Burley v. Upton*, 257 F. App'x 207, 210 (11th Cir. 2007) (affirming grant of summary judgment on deliberate indifference claim because the plaintiff's medical need predicated on lower back pain "was not so serious that 'if left unattended, [it] pose[d] a substantial risk of serious harm.'"). Because Plaintiff was not diagnosed

as needing medical care "until after the conduct he complains of, his claim requires evidence that 'even a lay person would easily recognize the necessity for a doctor's attention.'" *Patel*, 969 F.3d at 1189 (quoting *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019)).

> Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem.

*Hill*, 40 F.3d at 1187.

Here, taking the facts in the light most favorable to Plaintiff, he fell from a transport van in Defendant's presence, hurt his right knee and lower back, required assistance getting up and walking immediately after the incident, and told Defendant when he fell that he was injured and requested medical care. Further, from Plaintiff's representations, when Defendant returned Plaintiff from the Facility to the Jail approximately three hours later, Plaintiff still needed assistance walking. From this evidence, a jury could find that it was obvious even to a layperson that Plaintiff needed medical attention. By the time Plaintiff received medical care approximately twelve hours after his fall, his knee was swollen, an x-ray was requested, and pain relievers later were provided to Plaintiff. While there are disputes of material fact regarding the seriousness of Plaintiff's injuries, the evidence in the light most favorable to Plaintiff "creates jury

issues as to whether [he] had a serious medical need." *Harris*, 706 F. App'x at 951 (concluding that question of fact existed regarding whether the plaintiff inmate had a potentially serious medical need on the day of his fall where he had pain, swelling, and contusions).

Likewise, a question of fact exists regarding whether Defendant acted with subjective deliberate indifference. First, a reasonable jury could conclude that Defendant had subjective knowledge of a risk of serious harm necessitating medical treatment based on Plaintiff's unrefuted attestations and testimony that (1) on July 8, 2021, Defendant saw Plaintiff fall when exiting the transport van and require assistance getting up and walking into the Facility, (2) Plaintiff was limping, and (3) Plaintiff told Defendant that he was injured and asked for medical care. Further, per Plaintiff's attestations, he again asked Defendant for medical care after the pain in his knee and back became worse from trying to walk while handcuffed and chained to Dadd. In addition, Plaintiff maintains he continued to need Dadd's assistance to walk when Defendant transported the inmates back to the Jail from the Facility. Thus, a question of fact exists concerning whether Defendant had subjective knowledge of a risk of serious harm. *See, e.g., Patel*, 969 F.3d at 1190 (concluding that the evidence would allow the jury to infer "subjective knowledge of a risk of serious harm" where the defendant *inter alia* "witnessed symptoms that even a layperson could recognize as indicating that risk[.]").

Next, a question of fact exists regarding whether Defendant disregarded the risk of serious harm to Plaintiff. From Plaintiff's averments, after he told Defendant he was injured and requested medical care, Defendant ignored his requests. Despite purportedly knowing that Plaintiff was limping, required assistance walking, and was in pain, there is no evidence that Defendant ever attempted to "render first aid, report [Plaintiff's] injury to medical staff, . . . or transport [Plaintiff] to a medical facility." *Melton*, 841 F.3d at 1231 (concluding a question of fact existed regarding whether the defendant corrections officer was subjectively deliberate indifferent to the plaintiff inmate's serious medical need (a broken arm) where *inter alia* he observed the plaintiff fall and the plaintiff told the defendant of his painful injury, yet the defendant ignored the plaintiff's complaints of pain and did not render first aid, report the plaintiff's injury to medical staff or supervisors or coworkers, and did not transport the plaintiff to a medical facility).

Third, while a very close call in the Court's opinion, a question of fact exists regarding whether Defendant's conduct was more than grossly negligent. Although the seriousness of Plaintiff's medical need is disputed, the evidence in the light most favorable to Plaintiff reflects that he was limping, needed assistance walking, told Defendant he was injured and needed medical care, and was in pain for several hours before he received medical care. The seeming reasons for

Defendant's failure to seek medical care for Plaintiff were (1) he has no medical training, and thus, did not appreciate that Plaintiff had suffered a significant injury or had a serious medical need that posed a serious risk of harm if left unattended on that date, (2) he was only with Plaintiff for approximately ten minutes, and (3) he knew that inmates throughout VCDC have access to medical care. Nevertheless, in *Patel* the Court indicated that the conduct of the defendant officer "was worse 'than gross negligence'" where the defendant "utterly refused to respond to the severe symptoms that he saw."[5] 969 F.3d at 1190; *see also Melton*, 841 F.3d at 1231–32 (citing *Brown*, 894 F.2d at 1538 for the proposition that "denying or delaying medical treatment is tantamount to 'unnecessary and wanton infliction of pain' and concluding that facts existed from which a reasonable jury could find that an officer who witnessed the plaintiff injure himself and immediately complain of a popping sensation in his arm and intense pain was deliberately indifferent to the plaintiff's serious medical needs because he failed to treat the plaintiff's "injury or report the injury to medical staff or his superiors").

Finally, a question of fact exists regarding whether Defendant's deliberate indifference caused Plaintiff harm. "[A]s with any tort claim, [Plaintiff] must show

---

[5] The Court notes that the symptoms observed by the officer in *Patel* included unconsciousness, sweating, hyperventilating, shaking, profuse drooling, a severely runny nose, and difficulty speaking, which appear to be far more severe symptoms than those exhibited by Plaintiff in this case. 969 F.3d at 1189. In addition, the defendant in *Patel* had medical training. *Id.* at 1190.

that the injury was caused by the defendant's wrongful conduct." *Goebert*, 510 F.3d at 1312. Here, according to Plaintiff's averments, Defendant allowed him to fall, Plaintiff told Defendant he was injured, Defendant disregarded his request for medical care, Plaintiff then had to walk with Dadd's assistance into the Facility, Plaintiff again asked Defendant for medical care after the pain in his knee and back became worse from trying to walk while handcuffed and chained to Dadd, but Defendant did not get Plaintiff medical care. These facts create a jury question as to whether Defendant's actions caused injury to Plaintiff. For these reasons, the Court concludes that Plaintiff has presented sufficient evidence from which a jury could find the elements of a Fourteenth Amendment deliberate-indifference to a serious medical need claim.

### B.    Clearly Established Prong

"Under the clearly established prong, the dispositive question is whether the law at the time of the challenged conduct gave the government official fair warning that his conduct was unconstitutional." *Wade v. United States*, 13 F.4th 1217, 1226 (11th Cir. 2021) (citing *Hope*, 536 U.S. at 741).

> A plaintiff can show that the contours of a right were clearly established in one of three ways. First, a plaintiff can point to a "materially similar case that has already been decided." *Echols*, 913 F.3d at 1324 (quotation omitted); *Goebert*, 510 F.3d at 1330 (same). The case need not be "directly on point," but the "existing precedent must have placed the constitutional question beyond debate." *Echols*, 913 F.3d at 1324 (quotation omitted) (alteration adopted). Additionally, because "judicial precedents are tied to particularized facts," *Corbitt*,

929 F.3d at 1312 (quotation omitted), "[m]inor variations between cases may prove critical," *Youmans*, 626 F.3d at 563. Second, a plaintiff can point to a "a broader, clearly established principle that should control the novel facts of the situation." *Echols*, 913 F.3d at 1324 (quotation omitted). But a broader principle "must establish with obvious clarity that in the light of pre-existing law the unlawfulness of the official's conduct is apparent." *Id.* (quotation omitted) (alteration adopted); *Goebert*, 510 F.3d at 1330 ("The more general the statement of law is that puts the official on notice, the more egregious the violation must be before we will find that the official is not entitled to qualified immunity."). And third, a plaintiff can show that "the conduct involved in the case may so obviously violate the Constitution that prior case law is unnecessary." *Echols*, 913 F.3d at 1324 (quotation omitted) (alteration adopted). "This narrow category encompasses those situations where the official's conduct lies so obviously at the very core of what the relevant constitutional provision prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Id.* at 1325 (quotation omitted).

*Wade*, 13 F.4th at 1225-26.

As explained in *Patel*, "'[t]he knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.'" 969 F.3d at 1190 (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)). "This broad principle has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do nothing to address it, they violate the Constitution." *Id.* Consequently, when there is knowledge and intentional refusal, no more notice was necessary. *Id.*

Here, considering the facts as alleged by Plaintiff, Defendant provided no

timely aid and did not seek medical care for Plaintiff or report it to his supervisors when confronted with a purported serious medical need. Consequently, the Court concludes that Defendant is not entitled to qualified immunity.[6]

Accordingly, it is **ORDERED:**

1.     Defendant Norton's Motion for Summary Judgment (Doc. 58) is **DENIED**.

2.     Plaintiff shall file with the Court and serve upon Defendant a pretrial narrative statement within **TWENTY-ONE (21) DAYS** from the date of this Order. The Pretrial Narrative Statement shall contain:

  (a)    A brief general statement of the case;

  (b)    A narrative written statement of the facts that will be offered by oral or documentary evidence at trial;

  (c)    A list of all exhibits to be offered into evidence at the trial of the case;

---

[6] The Court finds Defendant's argument persuasive that this case is similar to *Wade v. United States*, 13 F.4th 1217 (11th Cir. 2021), which held that a corrections officer who was aware that an inmate had a serious medical need, a bleeding hand that ultimately was determined to have broken bones and required surgery, and failed to obtain medical treatment for the inmate's injury was entitled to qualified immunity because it was not clearly established that he acted with deliberate indifference to the inmate's constitutional rights. *Id.* at 1225–30. Like Defendant in this case, the corrections officer in *Wade* escorted the inmate for ten minutes to an area where the inmate had access to medical personnel and left him in the custody of other officers near medical personnel. *Id.* Nevertheless, the Court believes it is constrained by *Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990) and *Patel.*

(d)     A list of the full names and addresses and places of employment for all the non-inmate witnesses that Plaintiff intends to call (Plaintiff must notify the Court of any changes in their addresses);

(e)     A list of the full names, inmate numbers, and places of incarceration for all the inmate witnesses that Plaintiff intends to call (Plaintiff must notify the Court of any changes in their places of incarceration);

(f)     A summary of the anticipated testimony of each witness named in (d) and (e);

(g)     A stipulation of facts/issues to be tried; and

(h)     An estimated length of trial.

3.     Within **FOURTEEN (14) DAYS** from the date Plaintiff files his Pretrial Narrative Statement, Defendant shall file and serve upon Plaintiff a Pretrial Narrative Statement that complies with paragraph 2.

4.     If Plaintiff fails to file a Pretrial Narrative Statement, as required by paragraph 2 of this order, paragraph 3 of this order shall be inoperative and Defendant(s) shall notify the Court of Plaintiff's failure to comply within **FOURTEEN (14) DAYS** of such failure.

5.     After both sides have filed a pretrial narrative statement, the Court will enter a separate order setting the trial term and other pretrial deadlines.

6.     And although not required by the Court at this point, the parties may want to strongly consider settlement discussions. If the parties engage in settlement discussions, the Court requests that a joint notice be filed to

26

notify the Court. Upon filing of any notice of settlement discussions, the Court would also entertain a motion to stay the deadlines in this case.

**DONE** and **ORDERED** in Orlando, Florida on March 14, 2024.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party